# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 24, 2010

## STATE OF TENNESSEE V. ASHLEY MAI COOK

**Direct Appeal from the Circuit Court for Bedford County**
**No. 16258     Robert Crigler, Judge**

---

**No. M2009-00136-CCA-R3-CD - Filed February 24, 2011**

---

Defendant, Ashley Mai Cook, was convicted of conspiracy to commit first degree premeditated murder, a Class A felony, and first degree premeditated murder. She received consecutive sentences of twenty years as a Range I offender for conspiracy to commit first degree murder and life imprisonment for first degree murder. On appeal, she contends that the evidence is insufficient to support her convictions; that the trial court erred in denying her motion for expert services; that the trial court erred in not charging the jury that Megan Jones was an accomplice; and that her sentence was excessive. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Donna Orr Hargrove, District Public Defender; Andrew Jackson Dearing, III, Assistant Public Defender; Michael J. Collins, Assistant Public Defender; William Harold, Assistant Public Defender; Cathy Hickerson, Assistant Public Defender; and Stephanie Barka, Assistant Public Defender, Shelbyville, Tennessee, for the for the appellant, Ashley Mai Cook.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; Michael D. Randles, Assistant District Attorney General; and Michael J. Collins, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

During the early morning hours of February 14, 2007, Sergeant Nikia Elliott of the Bedford County Sheriff's Office was dispatched to a residence located at 2213 Highway 64 East in response to an "assault with a weapon" call. She had also been advised that there was a gunshot wound victim at the residence and that two unknown black male assailants had left the scene. Sergeant Elliott arrived at the residence and parked at the end of the driveway near the road. Other deputies and officers from the Shelbyville Police Department also arrived on the scene. As Sergeant Elliott walked up to the deck on the left side of the house, she saw an open door and a man, later identified as Justin Young, lying with his head and shoulders outside of the doorway. Mr. Young was yelling for help, and his hands and feet were tied with bailing twine. Sergeant Elliott noticed that his hands were "tied in front" of his body.

Mr. Young told Sergeant Elliott that his mother and another man were in the house. As Sergeant Elliott and other officers entered the residence to secure the scene, she saw a woman identified as Kimberly Ross lying on the floor in a bedroom directly across from the dining room and kitchen area. Mrs. Ross was screaming for them to help her and her husband, and there was a cell phone lying beside her head. Sergeant Elliott noticed that Mrs. Ross' hands were tied in front of her with a black electrical cord, and the cord was also wrapped around her ankles and "tucked under itself." Sergeant Elliott walked into the bedroom and saw a large spot of blood on the bed, and the victim, William Ross, was lying on the floor beside the bed with a large amount of blood both on and underneath his head. Although the victim was unable to respond to any questions, he was groaning and moving around. Sergeant Elliott also saw two small caliber shell casings on the bedroom floor.

After the scene was clear, Sergeant Elliott radioed for ambulance personnel to enter the house and assist the victim. She then took Mrs. Ross and Mr. Young, who were uninjured, out of the residence. As soon as they left the house, Mrs. Ross began screaming that her car, a 2007 gray Nissan Versa, was missing. Sergeant Elliott then issued a BOLO (be on the lookout) for the vehicle. Mrs. Ross told Sergeant Elliott that she and the victim were in bed when "two black males entered the home, one of which had come in their bedroom and asked where is Jimmy and William." She said that the men then shot the victim, tied her up, and left the residence.

Sergeant Elliott also talked to Mr. Young who said that he was in a bedroom further down the hall when one of the black males entered, held a gun to his head, and told him that if he remained calm, he would not be hurt. Mr. Young said that he heard gunshots coming from another area of the house, and then "another black male came in, and they tied him up."

-2-

Based on the information obtained from Mrs. Ross and Mr. Young, Sergeant Elliott issued a second BOLO for the two black assailants. Sergeant Elliott later learned that Mrs. Ross was not Mr. Young's mother. She said that Mr. Young's behavior at the scene was "kind of strange" to her because he did not want to talk to anyone after he told her what happened, and he was not crying or distraught.

Captain Brian Bruce, a paramedic for the Bedford County EMS, testified that he, along with paramedic Ted Cox and EMT Laura Reed, were dispatched to the scene on February 14, 2007, at 2:14 a.m., concerning a gunshot victim. They entered a side door of the residence and found the victim in a bedroom on his knees with his head and arms on the end of the bed. He looked up when Captain Bruce checked his pulse. The victim then laid down on the floor and pulled a blanket over himself. Captain Bruce noticed a circular wound on the left side of the victim's forehead above his eye that appeared to be a gunshot wound. He noticed "copious amounts of bleeding," and there "appeared to be gray brain matter coming from the wound." When EMS workers attempted to assess the victim, he became combative, which was indicative of shock and a head injury, and he had to be sedated. Captain Bruce discovered that the victim had additional gunshot wounds on the right side of his chest and on his left flank above the kidney. The EMS workers were unable to intubate the victim once he was loaded into the ambulance because of the amount of blood in the airway, and "he was still presenting with a gag reflex that it was unsuccessful." Captain Bruce testified that "Vanderbilt Medical Air Transport Unit Life Flight" was summoned to meet them at the "helipad" of the Bedford County Medical Center. After the ambulance arrived at the hospital, emergency room and life flight personnel continued efforts to treat the victim; however, he was ultimately pronounced dead in the back of the ambulance around 3:17 a.m.

Deputy Lindsey Puckett of the Bedford County Sheriff's Department testified that she was also dispatched to 2213 Highway 64 East during the early morning hours of February 14, 2007. She entered the bedroom where EMS workers were treating the victim, and they pointed out three gunshot wounds to her. Deputy Puckett also saw a cell phone and two .380 caliber shell casings with "an FC stamp for Federal cartridge" lying on the bedroom floor. In the living room, Deputy Puckett saw an open gun cabinet with a box of American Eagle .380 caliber ammunition inside. She did not find a .380 caliber weapon in the cabinet. Deputy Puckett explained that Federal and American Eagle ammunition are both manufactured by the same company, and "[a]ll Federal cases whether economy or otherwise are stamped FC." She then took over maintaining the crime scene log until another Deputy arrived.

Bedford County Sheriff Randall Boyce testified that he was called to the scene by Sergeant Elliott, and he arrived around 2:25 to 2:30 a.m. He saw Mrs. Ross and Mr. Young

-3-

outside sitting in a patrol car. The two claimed that the individuals who shot the victim had taken the Ross' car and a weapon from the residence. Sheriff Boyce testified that he was present when Mrs. Ross and Mr. Young were initially questioned together about the shooting. He said:

> [Mrs. Ross] stated that two black men had broke into the house asking for [the victim] and Jimmy. And Jimmy [Whitmire] was a guy that had lived with them in the past. And they had tied them up and shot Mr. Ross. Borrowed a gun out of the gun cabinet and shot Mr. Ross.

Sheriff Boyce testified that Mr. Young "told pretty much the same story" and said that he was asleep in bed on the opposite end of the house when the assailants entered the residence.

At some point, Mrs. Ross and Mr. Young were separated and questioned individually. During this interrogation, Mr. Young said that he helped Defendant climb into the house through a window. He then loaded the gun and showed Defendant how to use it. Mr. Young stated that Defendant entered the victim's bedroom and shot him while he was asleep. Sheriff Boyce testified that Mr. Young then told him where Defendant lived, and he drove to her house at 1837 South Cannon to look for the Ross' vehicle. He circled the area, and found the car "exactly half a mile from her residence parked in a church parking lot, a Church of Christ on South Cannon."

Detective Brian Farris of the Bedford County Sheriff's Department testified that he initially responded to the hospital during the early morning hours of February 14, 2007. The victim was deceased by the time that he arrived. Mrs. Ross and Mr. Young were also at the hospital because Mr. Young had twisted his ankle. The two were then advised to report to the sheriff's department when Mr. Young was released from the hospital. Detective Farris testified that he returned to the residence at 2213 Highway 64 East with Agent Wayne Wesson of the Tennessee Bureau of Investigation (TBI). They walked through the residence collecting evidence and taking photographs. Detective Farris saw Mrs. Ross' cell phone on the victim's bedroom floor but it was not collected at that time. Detective Farris was familiar with Mr. Young and Mrs. Ross' story, and he also knew that the Defendant had given a statement. However, he did not know the cell phone was a significant piece of evidence. Detective Farris testified that he was later contacted by Tammy Ross, the victim's sister, who told him that she had some things for him to see and hear. Tammy Ross met with him on February 19, 2007, and gave him the phone. Detective Farris found two text messages on the phone sent by Defendant on February 14, 2007. In the first message, sent at 12:37 p.m., Defendant indicated that Mrs. Ross "told" on her and that she was going to jail for murder. In the second message, sent six minutes later, Defendant indicated that she would tell

-4-

everything if Mrs. Ross did not help her. Detective Farris turned the messages over the Agent Wesson.

TBI Special Agent Wayne Wesson testified that he arrived at the scene around 4:58 a.m. on February 14, 2007, to assist in the investigation. He spoke with the Sheriff and other officers and was advised that the victim had been shot during a home invasion. Based on the facts that he had been given and his observation of the scene, Agent Wesson questioned the home invasion scenario and decided to speak with Mrs. Ross and Mr. Young at the sheriff's department. He spoke briefly with both of them together and then separated them for interviews. Agent Wesson first spoke with Mrs. Ross. He said:

> She told me pretty much what I had already heard, that two black males had entered the residence and they had come in through Justin's bedroom window. They had tied him up and escorted him down the hallway, and she woke up to see them coming down the hallway. She gave me some description of them, what they were wearing, what they looked like and that sort of thing.
>
> And then she told me that they tied her up and then walked her over to the bedroom door and then shot Bill and left, taking the keys to the Nissan Versa which were laying on the kitchen table.
>
> I sort of backed up. I said when did they tie your feet? She said oh, well, they tied my feet and then kind of hobbled me over there or something to that effect, just pushed her down on the floor after the shooting when they were asking for Jimmy Whitmire and Bill.
>
> So I really got the same story, which to me was still far fetched.

At some point, Agent Wesson realized that Mrs. Ross was not telling the truth. He stopped the interview and Mirandized her.

Agent Wesson then spoke with Mr. Young and advised him of his *Miranda* rights. Mr. Young waived his rights and gave a statement. He told a similar story of a home invasion by two black males and that they took a .380 pistol from the gun cabinet that belonged to Mrs. Ross, shot the victim and took the keys to the car. Mr. Young referred to the victim as "dad" and Mrs. Ross as "mom;" however, he said that they were not his biological parents and that he lived with them.

Agent Wesson testified that there were several discrepancies in Mr. Young's and Mrs. Ross' stories. Mr. Young told him that one of the men was wearing purple surgical gloves;

however, Mrs. Ross had told him that both of the men were wearing the purple gloves. There was also "some discrepancy about their hat, what they were wearing on their face." Agent Wesson was also suspicious of Mrs. Ross' claim that the "sea grass string" came from the bed rails underneath Mr. Young's bed and that it was used to tie the rails together.

Because he knew that Mrs. Ross and Mr. Young were being untruthful, Agent Wesson told them that the victim was still alive and that they were attempting to talk to him. After a short break in questioning, Agent Wesson re-interviewed Mr. Young. Mr. Young told him that Defendant had been receiving assistance from the victim and Mrs. Ross, and she became angry because the victim was going to cut off her financial assistance. Mr. Young said that Defendant entered the house through his bedroom window, tied up Mrs. Ross and him, shot the victim with the pistol, and left the residence with thirty dollars and keys to the Nissan Versa. Agent Wesson also interviewed Mrs. Ross a second time. She told him that she lied during the first interview because she was afraid for her life. Mrs. Ross claimed that she woke up and saw Defendant and Mr. Young walking down the hall and that Defendant was mad and "was going to see to it that she was not cut off." Mrs. Ross said that Defendant took a gun out of the gun cabinet, placed the clip in the gun, and "racked it and then walked over to the door, shot Bill and tied them up." She said that Defendant threatened to kill them and told them to say that two black males perpetrated the offenses. Mrs. Ross said that after Defendant left, she crawled to the bedroom door, saw the victim moving around, and dialed 911 on her cell phone.

Agent Wesson testified that Defendant's trailer on South Cannon Boulevard was located, and he and Sheriff Boyce drove to the residence and spoke with Defendant who agreed to accompany them to the sheriff's office for an interview. Prior to the interview, Defendant signed a waiver of her *Miranda* rights. She then gave the following written statement:

> On 2-24-07, Justin Young, my adopted brother who lives with mom, Kimberly Ross, and dad, William Ross, over at Highway 64 East in Shelbyville, called me at 1:02 a.m. He told me something was going on over there and he needed me to come over there. His cell number is 931-637-4957.
>
> He told me to come to his bedroom. I hired an MTS Cab to drop me off at the BP or the Golden Gallon station at the corner of Madison Street and 64 East. From there I walked the rest of the way. I didn't want to wake anyone up by pulling in to the driveway. I didn't know who might be awake or what.
>
> A friend of mine, Rodney Tinnell, was staying at my house [on South Cannon]. I left at about 1:15 a.m. Tinnell was there when I left.

When I got to mom's, I walked up to Justin's window. He told me to take the Nissan away from the house, but don't take it home. I didn't ask any questions. I took the Nissan and drove to a church on Cannon and left the car there. I took the keys with me, and the keys are at my house now. They are in my top drawer.

I got back home a little after 2 a.m. Rodney Tinnell was still there. I think he left about 4 a.m. I thought he had to leave for work this morning. Ashley Cook.

After a short break, Agent Wesson interviewed Defendant a second time. He intended to tell Defendant of the contradictions between what she had told him and the stories told by Mr. Young and Mrs. Ross. At that point, Defendant stopped him and said, "[C]an I tell you something?" She then gave the following statement:

I have known the Rosses, Kimberly and William, for the past four months. About two months ago, mom, Kimberly, started talking to me about killing dad, William. Mom said that dad was beating on her and that we had to take her to the hospital on a couple of occasions.

Her arm was fractured on one occasion. And on another, she had to have several stitches [in] her head. She has had broken ribs, bruises and other injuries. She has told me and Megan Jones, my exgirlfriend [sic], that dad had to die. She told us that it would be easy to get away with it, that she could blame it on a lot of people. She could say that someone was looking for Jimmy Whitmire.

A few days ago, Justin Young told me that he was going to kill dad with a knife. I made him leave the knife at my house. He and Travis Galloway, mom's real blood son, came and stayed the night with me. When Justin got there, he had a big knife. That knife is still at my house. He left it there so he wouldn't kill dad with it.

Yesterday, February 13, '07, mom had Justin call me. She said Ashley, you can do it tonight. I'll load the gun for you, clean it up, and afterwards you can take the car. She gave me the gun, the keys and everything as soon as I got there.

-7-

Justin opened the window in his room. They left the ladder outside for me and everything. Justin said if you don't do it, then I'm going to do it. They both kept trying to talk me into killing dad.

They said if Travis done it, he would get caught. If mom done it, she would get caught. They said I was the only one who could get away with it. So on the 13th, the plan started coming together.

Mom called and then Justin called. Justin said this is what we are going to do. He said, Ashley, I will call you at 11 p.m. and tell you where everything is. You won't need to get here until about 1:00 a.m. Come here and I will tell you what to do when you get here.

He called me at 11:00 p.m. and then again at 1:00 a.m. He said okay, come on down. I called a cab and went to the Golden Gallon. I walked the rest of the way. When I got there, he opened the window and helped me in. The ladder was also outside for me. He said here is $10. Here is the keys to the car. He said he had already tied mom's hands up. He said for me to tie his hands, and he gave me the gun. He had already tied his feet.

Then he told me to stand in the doorway and shoot him. He said dad was asleep and wouldn't even know I was there. Justin and mom were in the living room sitting on a chair while I went over to the bedroom door and opened it.

I stood in the doorway and fired some shots. I think I fired two or three times. I don't know where I hit him at.

I just turned around and headed toward the door. I got in the Nissan car and left. I drove to the church parking lot and parked the car, took the keys with me.

I walked home. I threw the gloves out, purple latex gloves, close to the Kangaroo Market. I took the gun home with me. It's underneath my mattress.

Mom told me when I got there, to throw the gun in the river. Then she changed her mind and told me to keep it because it was registered to her.

I was wearing the clothes that I have on, a blue hooded sweatshirt, black sweatpants, black shirt, black tennis shoes. The tennis shoes are at my house.

They are Reeboks. Megan Jones used to be a medic and left a few of those purple gloves in my bedroom cabinet.

Defendant told Agent Wesson that she took the purple gloves from her residence on the night of the murder and that she was wearing them when she entered the house and killed the victim.

After he spoke with Defendant, Agent Wesson conducted a third interview with Mr. Young who told him that Mrs. Ross said that the victim was abusing and raping her. Mr. Young told Agent Wesson that on one occasion, Mrs. Ross was taken to the hospital for stitches because the victim had pushed her head into a dresser. Mrs. Ross then told him that the victim had to die. Mr. Young told Agent Wesson that Mrs. Ross thought that Defendant knew someone who would kill the victim, and the idea was "tossed" around and talked about for a while until a plan was developed. Mr. Young said that on February 13, 2007, Mrs. Ross told him to call Defendant and tell her to enter the house through the window. He said that the murder was originally supposed to take place on during the early morning hours of the 13th, but it did not happen until the earl morning hours of February 14, 2007. Mr. Young told Agent Wesson that Mrs. Ross directed him to clean the gun, wipe it down, and load it for Defendant. When Defendant arrived, he gave her the gun and thirty dollars. Mr. Young said that he had already tied his feet, and Defendant tied his hands. She also tied up Mrs. Ross. Defendant then opened the bedroom door and shot the victim. After the shooting, Mrs. Ross directed Defendant to "get rid of the gun," and she dialed 911 after Defendant left.

Agent Wesson also conducted a third interview with Mrs. Ross. She implicated herself in the plan to kill the victim, and for the first time claimed that the victim had been abusing and raping her and that he had raped her on the night of the murder.

At some point on February 14, 2007, Agent Wesson prepared and obtained a search warrant of Defendant's residence. As a result of the search, a Bersa .380 pistol with two live rounds and a large hunting knife were found in Defendant's bedroom between the mattress and box springs. A pair of black Reebok tennis shoes were also taken from the residence, and several pairs of purple surgical gloves were found underneath the bathroom sink. Agent Wesson did not find the keys to the Nissan Versa at Defendant's residence; however, Megan Jones later found them in a drawer there while gathering some of her personal property and brought them to Agent Wesson.

Agent Wesson testified that the returned to the crime scene and processed the residence for additional evidence. The window sill where the ladder was located was dusted for fingerprints, and he collected the box of .380 American Eagle ammunition from the

gun cabinet. Three shell casings were found in the victim's bedroom. Agent Wesson testified that he did not collect the cell phone found in the room because he had no reason to believe that it had any evidentiary value. The phone, belonging to Mrs. Ross, was later turned over to him with text messages from Defendant. As a result of his investigation, Agent Wesson charged Defendant, Mrs. Ross, and Mr. Young with first degree murder and conspiracy to commit first degree murder.

Special Agent Alex Broadhag, a firearms examiner with the TBI crime lab, testified that he examined the .380 Bersa pistol, clip, two unfired .380 cartridges, and three .380 fired cartridge casings. The pistol was "fully functional," and he determined that the clip held seven rounds. Agent Broadhag testified that the three fired cartridges were manufactured by the Federal Ammunition Company and were fired from the Bersa pistol. He also received three bullets from the medical examiner's office that were recovered from the victim's body, and he determined that they were fired through the pistol.

Rodney Tinnel testified that he lives in Columbia, Tennessee and is employed by FS Sperry. He admitted that he has prior convictions for especially aggravated robbery and possession of a Schedule II drug for resale. Mr. Tinnel testified that around 2:00 to 2:30 p.m. on February 13, 2007, he received a call from Defendant, whom he had known for three or four months, inviting him to her residence in Shelbyville. He agreed to visit if she had someone for his friend, Vinson Floyd, to meet. Mr. Tinnel testified that he and Mr. Vinson arrived at Defendant's residence around 10:00 to 10:30 p.m. on February 13, 2007, and she said that her friend had already left. He and Defendant walked to the back bedroom, talked for a while, and Mr. Tinnel fell asleep. Sometime between 1:30 and 2:00 a.m., Mr. Vinson woke Mr. Tinnel up and said that Defendant was gone. Mr. Tinnel testified that he and Mr. Vinson decided to leave and that as they were backing out of the driveway, they saw Defendant walking up the side of the road.

Vinson Floyd testified that he also lives in Columbia, Tennessee, and on February 13, 2007, he was working at FS Sperry with Mr. Tinnel. He testified that on that date, Mr. Tinnel received a phone call from Defendant, and they drove to her trailer later that night after leaving work. Defendant had agreed to have a friend at the residence for him to meet, but no one else was there when he and Mr. Tinnel arrived. Mr. Vinson testified that Defendant and Mr. Tinnel went to the bedroom, and he was on the couch in the living room. He ate something and used Defendant's cell phone. Mr. Vinson testified that when Defendant emerged from the bedroom, he pretended to be asleep. Defendant called someone on her cell phone and said something about "them" sleeping. Mr. Vinson testified that he sat up and asked Defendant what she was doing. Defendant then asked if he wanted to ride with her and her brother to "get some weed." Mr. Vinson testified that he declined, and Defendant left the residence wearing "[s]ome black pants and a blue hoodie, dressed up like

a ninja." After Defendant left, Mr. Vinson woke up Mr. Tinnel, and they left. He saw defendant walking up the street as they were leaving. Mr. Vinson and Mr. Tinnel were later interviewed at the Bedford County Sheriff's Department.

James Johnson, a taxi driver for Mullins Transportation Service (MTS), testified that prior to February 14, 2007, he was familiar with Defendant and knew her address because he had picked her up on prior occasions. Mr. Johnson testified that he was dispatched to the Legacy Trailer Park at 12:54 a.m. on February 14 to pick up Defendant and drive her to the Golden Gallon located at the intersection of Highways 41 and 64. He was then supposed to drive her back home. Mr. Johnson testified that he had picked up another passenger prior to arriving at the trailer park. He picked Defendant up, and as they were driving down the road, Defendant said, "It's going to be a long night." Mr. Johnson testified that after they arrived at the Golden Gallon, Defendant and the other passenger walked inside. The other passenger returned to the car; however, Defendant walked out of the store and to the left around the corner and got into a red truck. She never paid her fare.

Megan Jones testified that at the time of trial she was on probation for theft. At that time, she had known Defendant for nearly three years, and they were once "girlfriends as in lovers." They first lived in Lewisburg, Tennessee with Ms. Jones' sister and later moved to a trailer on South Cannon Boulevard in Shelbyville. Ms. Jones testified that on February 14, 2007, she had known the victim and Mrs. Ross, who once lived in Lewisburg, for almost three years. She had met Mrs. Ross through Ross' son, Travis Galloway. Ms. Jones later introduced Defendant to Mrs. Ross. Ms. Jones testified that Defendant became close to Ms. Ross and began calling her "mom or mama." She said that Mrs. Ross found the trailer on South Cannon for them and paid the rent and utilities. Ms. Jones also said that she and Defendant were not employed at the time and were "totally financially dependent"on Mrs. Ross. She and Defendant later became employed for a month and a half.

Ms. Jones testified that while the victim and Mrs. Ross lived in Shelbyville, Travis Galloway was in the state's custody and living with foster parents because of a juvenile offense. Mrs. Ross also had two other children who lived in Oklahoma. Ms. Jones testified that she had previously been employed in the medical field, and often took Mrs. Ross to the hospital. She estimated that Mrs. Ross made over fifty trips to various hospitals for injuries and illness, and she took a lot of medication. She was admitted to the hospital on several occasions. Ms. Jones testified that Mrs. Ross "almost" always left the hospital with a prescription for narcotics.

Ms. Jones testified that she, Defendant, and Mrs. Ross were together daily after Ms. Jones and Defendant moved to Shelbyville. Ms. Jones remembered four or five conversations where Mrs. Ross said that she wanted to get rid of the victim. Although Mrs.

-11-

Ross claimed that the victim abused her, Ms. Jones saw no signs of abuse. Mrs. Ross did not want to divorce the victim because she would lose everything. Ms. Jones testified that on one particular occasion, during a trip to the Dollar General, Mrs. Ross said that she wanted to "off " the victim, and she mentioned a home invasion. Ms. Jones said, "She said that she could tie herself up to make it to where her cell phone would be beside her, where she could press 911, call 911 and state that it was a home invasion, that two [black] people broke in her house." A gun was also discussed, and Defendant indicated that she knew where to find an untraceable one. Ms. Jones testified that Defendant seemed uninterested in killing the victim until Mrs. Ross mentioned life insurance.

Ms. Jones testified that on another occasion, Mrs. Ross called her cell phone and asked to speak with Defendant. Defendant took the phone and said, "I'll be there in just a minute. I have to make a phone call to get the piece." Ms. Jones testified that Defendant then walked into the bedroom, dressed in black clothing, and made a call on her cell phone. During the conversation, Ms. Jones heard Defendant say that she needed the "piece." Ms. Jones understood "piece" to mean a gun. Defendant left and later called back to tell Ms. Jones that it "didn't happen." She came back home and before going to bed, told Ms. Jones not to answer the phone if Mrs. Ross called. Ms. Jones testified that during another conversation at Mrs. Ross' home, Mrs. Ross said that she could place a ladder up to Mr. Young's bedroom window "so somebody could crawl up the ladder." Defendant thought it was a good idea. Ms. Jones testified that she had several pairs of purple surgical gloves underneath the kitchen and bathroom cabinets at the trailer on South Cannon because she had once been employed in the medical field, and she was using the gloves to clean up after a puppy.

Ms. Jones testified that she moved out of the trailer on South Cannon around a week before the murder because she and defendant had a fight, and Defendant took out a restraining order against her. As a result, she was not allowed to go back to the residence to get her belongings, including the purple surgical gloves. Ms. Jones testified that she showed up at a hearing on February 14, 2007, for the order of protection, and she was advised to report to the sheriff's office. That afternoon, she was allowed to go to the trailer and get her belongings. While there, Ms. Jones found the keys to the Nissan Versa in a drawer and turned them over to the sheriff's department. Ms. Jones testified that she did not believe that Defendant, Mrs. Ross, and Mr. Young would go through with the plan to kill the victim, and she would have warned him if she had known they were serious.

Justin Young testified that he and Travis Galloway met and became friends while attending high school in Marshall County. He met the victim and Mrs. Ross, Mr. Galloway's mother, and he would spend the night at their residence from time to time. Mr. Young testified that Mr. Galloway was placed in the state's custody in December of 2006.

Sometime in January of 2007, Mr. Young saw Mr. Galloway while he was at home on a weekend pass, and he asked Mr. Young to move into the residence to watch after Mrs. Ross because she was sick. Mr. Young agreed and moved in at the end of January. Around that time, he met Defendant through Megan Jones.

Mr. Young testified that while he was living in the Ross residence, Defendant and Ms. Jones would come over to do laundry. He did not believe that the victim liked Defendant and Ms. Jones being there. Mr. Young testified that he and the victim got along well, and he never saw the victim hit Mrs. Ross. In February of 2007, Mrs. Ross began talking about killing the victim. She said that the victim "would just have to go" and that she needed him to leave or be gone. She also said that he had beaten and raped her. Mrs. Ross expressed these thoughts to Mr. Young, Defendant , and Megan Jones. Mr. Young testified that he asked Mrs. Ross about divorcing the victim, but she said that she would be left with nothing.

Mr. Young testified that approximately "a week to a week and a half" before the murder, he and Ms. Jones took Mrs. Ross to Nashville for some blood work. While they were at McDonald's, Mrs. Ross pretended to have a stroke in the parking lot. An ambulance was called, and she was taken to the hospital where she was admitted and remained overnight. Mr. Young said that during that time, Mrs. Jones and Defendant had several telephone conversations. He said: "[Mrs. Ross] would say is it done yet? Have you taken care of it? When are you taking care of it? And stuff like that." Mr. Young testified that on the way home from the hospital, Mrs. Ross spoke with the victim. After she hung up, Mrs. Ross indicated that the victim was "supposed to be gone" or "taken care of last night." She seemed surprised to talk to him on the phone.

Mr. Young testified that sometime after the trip to Nashville, Mrs. Ross again said something to him and Defendant about killing the victim, and a new plan was discussed. According to the plan, Defendant was to take a cab to a store near the residence, walk to the house, and climb through Mr. Young's bedroom window by a ladder because the side door opened into the kitchen near the victim's bedroom, and the front door made a loud pop when it opened. Defendant would then be given a gun to shoot the victim while he was in bed asleep. Mr. Young said:

> I was supposed to make sure the gun was in the gun cabinet and had the clip already in it waiting on her. And Kim was supposed to have the phone and everything ready so whenever she got there she could leave, take the car that was in the driveway and the money that was with the keys and leave.

Mr. Young testified that he was also supposed to wipe down the gun. He and Mrs. Ross were to be tied up, and they would tell police that two black men broke into the residence and

-13-

mistook the victim for Jimmy Whitmire. He said that Defendant was to "ditch" the gun and leave town. Mr. Young testified that he plan went into action during the evening of February 13, 2007, and the early morning hours of February 14. He said that the plan was originally supposed to happen the night before; however, Defendant could not be there. Mr. Young testified that Defendant never expressed any reluctance to be a part of the plan.

Mr. Young testified that after the victim left for work on the morning of February 13, 2007, he and Mrs. Ross went to the store a couple of times. He then loaded the .380 pistol with five rounds, wiped it down, and placed it back inside the gun cabinet with one door left slightly ajar. Mr. Young testified that he and Mrs. Ross had several phone conversations with Defendant during the day to make sure that she was coming over and to let her know that everything was "ready to go" when she arrived. Mr. Young testified that the victim arrived home from work around 8:00 p.m., and he and Mrs. Ross ate supper with him and watched television. Mrs. Ross and the victim went to bed between 9:00 and 10:00 p.m. Mr. Young called Defendant a couple of times "[t]o make sure that she was coming, and to see why she was taking so long." Defendant indicated that she would be there around 12:00 to 12:30 a.m.

Mr. Young thought that Defendant arrived at the house around 1:30 a.m, climbed up the ladder to his bedroom window, and he helped pull her inside. Defendant was wearing a blue hoodie and purple latex gloves at the time, and he walked with her to the living room where Mrs. Ross was waiting. He also gave her the keys to Mrs. Ross' Nissan Versa and $30 or $40. Mr. Young testified that Mrs. Ross took the .380 pistol out of the gun cabinet and showed Defendant how to use it. She chambered a round so that all Defendant had to do was "point and shoot," and handed it to her. Mr. Young testified that he and Mrs. Ross sat down, and Defendant tied his hands and feet with bailing twine and Mrs. Ross was tied with a phone cord. During that time, Defendant dropped the gun twice. Mr. Young testified that he positioned himself on the floor between the chair and the hallway, and Mrs. Ross was laying on the couch with her cell phone on the arm of the couch.

Mr. Young testified that the victim was asleep in the bedroom with the door cracked, and the television on. He said that Defendant walked to the bedroom door, pushed it open with her foot, and began shooting. Mr. Young heard three shots, and he said that the victim screamed after the first shot. Defendant ran out the side door of the house and left in the car. Mrs. Ross then dialed 911 on her cell phone. Mr. Young testified that the victim had fallen out of the bed after the first shot, and he could see Defendant struggling to stand up. After police arrived and he and Mrs. Ross were taken out of the house, Mr. Young twisted his ankle on the sidewalk, and he was later taken to the emergency room.

Mr. Young testified that he and Mrs. Ross told deputies that two black males broke into the house looking for Jimmy Whitmire. He also initially told the same story to Agent

Wesson, but later told him that Defendant shot the victim because she was angry that she had been cut off from financial assistance. Mr. Young testified that he finally told Agent Wesson the truth during their third conversation after Agent Wesson told him that Defendant had confessed to being involved in the plan, and she pointed the finger at him and Mrs. Ross. He said that if the plan had worked, he planned to move to Oklahoma with Mrs. Ross and Travis Galloway. Mr. Young testified that he was a willing participant in the murder plan, and Mrs. Ross did not exert any undue influence over him or Defendant, although she could be very persuasive at times. He said that Mrs. Ross provided both him and Defendant with financial assistance. Mr. Young testified that the two black men that Defendant had arranged to come to her trailer on the night of the murder was not part of the plan that they had all discussed.

Reverend Ray Hartman of the United Methodist Church in Cornersville, Tennessee testified that he is acquainted with Mrs. Ross and had spoken to her at least four times. He first met her in the in fall of 2006 when Mrs. Ross befriended a student at Cornersville High School whose mother had passed away, and she took him into her house. He said that Mrs. Ross claimed that the student's mother was her best friend, and she took it upon herself to plan the funeral. She also told him that she was pregnant with triplets. Reverend Hartman testified that Mrs. Ross claimed to be a minister and said that she had performed weddings and ministered to several young adults in her home. Reverend Hartman testified that he took a meat tray by Mrs. Ross' house and met the victim who did not seem surprised when Mrs. Ross said that she was pregnant with triplets. Reverend Hartman testified that Mrs. Ross planned to do the speaking at the funeral, and he and two other ministers had a small role in the service. During the service, Reverend Hartman was concerned about Mrs. Ross' unprofessional appearance, and her eulogy was disjointed and seemed unusual.

Defendant testified that she was twenty-three years old at the time of the offense and was living on South Cannon Boulevard in Shelbyville. She said that her girlfriend, Megan Jones, lived with her until the end of January 2007 when she became upset because Ms. Jones had a sexual encounter with Justin Young. She and Ms. Jones had previously lived in Lewisburg, and Ms. Jones introduced her to Kimberly Ross while they were living there. Defendant testified that she saw Mrs. Ross at least four or five times a week, and Mrs. Ross later wanted her and Ms. Jones to move to Shelbyville to help take care of her. She said that Mrs. Ross found the trailer on South Cannon, paid the rent, bought groceries, and provided transportation to her and Ms. Jones. At some point, Defendant and Ms. Jones went to work at Sharpie; however, Mrs. Ross continued to help them pay rent, and provide transportation.

Defendant testified that she never really knew her birth mother, and she moved frequently during her school-age years. Therefore, Mrs. Ross became like a mother to her. Defendant said that "for the most part" she did whatever Mrs. Ross asked her to do. She said that three or four times a week, Mrs. Ross would say that the victim "had beaten her and he

had raped her several times." Defendant testified that she saw bruises that appeared to be fingerprints on Mrs. Ross' arms, and Mrs. Ross once had a sprained wrist because she said that the victim slammed her hand in the door. On another occasion, Defendant saw a gash on Mrs. Ross' forehead. Defendant testified that she had once been in an abusive relationship with her husband, and she lost a child due to the abuse. Therefore, Defendant said that she was very sympathetic to Mrs. Ross and began to relate more and more to Mrs. Ross' problems. She said that Mrs. Ross would not leave the victim because she would lose everything. Defendant agreed that she and Ms. Jones took Mrs. Ross to many different doctors and hospitals, and she received various pain medications, such as Lortab, Morphine, Demerol, Xanax, and Clonopins.

Defendant testified that she first met Justin Young near the end of January 2007 when Ms. Jones moved out of the trailer on South Cannon after police were called. Ms. Jones eventually moved back to Lewisburg. Defendant testified that from February 1 through 13, 2007, she spoke with Mrs. Ross daily. She said, "So in the afternoons, most every afternoon we would have to go to the doctor or take her to the emergency room, because she had stated Bill had beaten her and he had raped her." Defendant felt that Mrs. Ross needed to get away from the victim, which she told Mrs. Ross several times. Defendant testified that Mrs. Ross first mentioned killing the victim after December of 2006, and Defendant told her that she was "crazy" and needed to divorce him. She said that there were three or four conversations about killing the victim, initiated by Mrs. Ross, when Defendant, Mr. Young, and Ms. Jones were present. Mrs. Ross indicated that she had to find a way to kill the victim, or she would kill herself. Defendant said that she did not believe Mrs. Ross was serious. Defendant was concerned about the health and welfare of Mrs. Ross, and this concern escalated as the days went by.

Defendant testified that during the weekend before February 14, 2007, she had a phone conversation with Mrs. Ross, Mr. Young, and Travis Galloway. As a result of the conversation, she asked Mr. Young and Mr. Galloway to come over to her house. They were angry with the victim, and Defendant took a large hunting knife from them and placed it under her mattress. She said that Mr. Young and Mr. Galloway spent the night at her house and then left. Defendant testified that on the day of February 13, 2007, she had several casual telephone conversations with Mrs. Ross and Mr. Young. She said that she invited Mr. Tinnel to her residence to buy drugs for a co-worker. Defendant testified that Mr. Tinnel and Vinson Floyd arrived at her trailer around 10:30 to 11:00 p.m. on February 13, 2007. She said that Mr. Tinnel did not bring the drugs so they sat around and talked for a while, and Mr. Tinnel went to sleep in her bedroom. Defendant testified that she later received a call from Mr. Young, who told her that the victim had beaten and raped Mrs. Ross, and she could hear Mrs. Ross in the background "acting kind of hysterical," and it sounded like she was hyperventilating. Mrs. Ross said that she needed to go to the hospital and asked Defendant

-16-

to help her. Defendant said that she was concerned for Mrs. Ross' safety and wanted to get her away from the victim before she suffered further harm.

Defendant testified that Mr. Tinnel and Mr. Floyd were still at her home while she was talking to Mr. Young, and she said "is he asleep" or something similar referring to the victim. She "didn't want to go over there with him still awake and have some kind of issue with him being awake and trying to get Kim out of the house." Defendant testified that she was instructed to take a cab to the store near the Ross' residence because Mrs. Ross did not want a car to pull in the driveway and wake the victim. She was to then knock on Mr. Young's window. Defendant testified that she left her residence wearing a baby blue pullover and a pair of black sweat pants. She said that she gave her telephone number to the cab driver, who she had ridden with several occasions, because she planned to have him pick her back up after she got Mrs. Ross out of the house. She admitted that she did not pay the driver and said that she planned to pay him on the return trip.

Defendant testified that she walked from the store and down the Ross' driveway to Mr. Young's window. She then climbed up the ladder, and Mr. Young helped pull her inside. Defendant denied having any purple latex gloves with her at the time. She and Mr. Young then walked into the living room where Mrs. Ross was standing. Defendant testified that Mrs. Ross and Mr. Young then began "going back and forth about who was going to kill Bill," and they were passing a gun back and forth. Defendant said that she became concerned because she did not want Mrs. Ross or Mr. Young to go to jail for killing the victim. She testified that Mrs. Ross then pushed the gun in her "face," and she "took the gun, turned maybe half a circle and pulled the trigger maybe three times." Defendant said that she was in shock after the shooting, and Mrs. Ross then handed her a pair of purple gloves and the keys to her car. Mrs. Ross told her to go home and that she would take care of everything. Defendant testified that Mrs. Ross also told her to take the gun with her since it was registered to Mrs. Ross. Defendant then put on the gloves, got in the car, and left. On the way home, the car had a flat tire around a half-mile from her trailer, and she parked it in a church parking lot and took the keys with her. She later spoke with Agent Wesson and gave two statements. Defendant testified that Mrs. Ross exerted "a lot of control over my thoughts," and she would do just about anything that Mrs. Ross wanted. She said that she did not go to the residence on February 13, 2007, to participate in killing the victim.

On cross-examination, Defendant testified that discussions about killing the victim began in December of 2006 and continued until February 13, 2007. She said that she was not present when Mrs. Ross talked about how she wanted the victim killed. Defendant testified that Mrs. Ross never "personally" asked her to kill the victim, and she told Mrs. Ross that she was "crazy" when Mrs. Ross talked about killing him, and she never thought that Mrs. Ross was serious. Defendant testified that a couple of weeks before the murder,

Mrs. Ross had asked Megan to find someone to kill the victim, and Mrs. Ross called on the way home from the hospital in Nashville to ask if it was "taken care of."

Defendant testified that Mr. Young and Mrs. Ross called on February 13, 2007, to see how her day was going. They did not call to finalize the murder plans. Defendant said that she invited Rodney Tinnel to her home to buy drugs, and she did not know that he was bringing Floyd Vinson. Mr. Tinnel did not have any drugs when he arrived. Defendant admitted that she used her cell phone while Mr. Tinnel was asleep in the bedroom, and Mr. Vinson was in the living room. She denied saying that "they" were sleeping during the conversation.

Defendant testified that Mr. Young called her sometime after midnight on February 14, and said that Mrs. Ross had been beaten and raped, and they wanted her to help get Mrs. Ross out of the house before the victim woke up. She said that Mrs. Ross and Mr. Young were afraid of the victim even though he was asleep. Defendant admitted that she asked Mr. Vinson to go with her, but she did not tell him why. She only said that she wanted to get some marijuana and beer, but he declined. Defendant testified that the plan was for Mr. Young to take Mrs. Ross to the hospital after they removed her from the house, and Defendant planned to return to the Golden Gallon and take the cab back home.

Defendant admitted that she told Agent Wesson that she was wearing purple latex gloves when she arrived at the house, but it was not the truth. She said that at the time of the murder, Mrs. Ross and Mr. Young were arguing about who was going to get the chance to kill the victim, and Defendant told them that they were not going to kill anyone. Defendant said that Mrs. Ross then shoved the gun toward her chest area or hands, rather than her face, and she turned around and shot the victim. She testified that the bedroom door was already open enough for her to shoot the victim. Defendant had no explanation as to why she shot the victim three times. She claimed that although each shot hit the victim and was fatal, none of them were aimed shots. Defendant testified that Mrs. Ross gave her the purple gloves as she was leaving the house so that Defendant would not leave prints on the car; however, she took the gloves off while she was driving the car and tossed them out the car window because one of the fingers was torn. She also said that Mrs. Ross and Mr. Young tied themselves up after she left. Defendant testified that she placed the pistol in her front pocket as she walked home, and she did not see Mr. Tinnel and Mr. Floyd leaving her residence. Defendant testified that although she called the victim "dad," he was not a father figure to her. She said that she did not tell the truth in her two statements to Agent Wesson because she was still in shock.

## II. Analysis

*A. Sufficiency of the Evidence*

Defendant contends that the evidence was insufficient to establish premeditation with respect to her first degree premeditated murder and conspiracy to commit first degree murder convictions. More specifically, she asserts that the evidence against her was circumstantial and that "[t]he testimony of Justin young and Megan Jones shows the dominion and control exerted upon [Defendant] by the co-defendant, Ms. Ross and negates the premeditation element in that the intent to kill was not formed prior to the act."

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). A conviction may be based entirely on circumstantial evidence where the facts are so clearly interwoven and connected that the finger of guilt is pointed at the Defendant and the Defendant alone." *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002) (quoting *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993)).

First degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact to be determined by the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our Supreme court has delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

"The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense." T.C.A. § 39-12-103(a) (2003). The offense of conspiracy is aimed at group criminality and is based upon the principle that group criminal activity poses a greater public threat than criminal offenses committed by a single individual. *Id.* at Sentencing Commission Comments. While the essence of the offense of conspiracy is an agreement to accomplish a criminal or unlawful act, the agreement need not be formal or expressed, and it may be proven by circumstantial evidence. *State v. Shropshire*, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993); *State v. Hodgkinson*, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy implies concert of design and not participation in every detail of execution." *Randolph v. State*, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). No person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proven to have been committed by at least one member of the alleged conspiracy. T.C.A. § 39-12-103(d). As relevant in this case, first degree murder is a "premeditated and intentional killing of another." T.C.A. § 39-12-201(a)(1). Thus, in order for these convictions to be supported, the State was required to prove that Defendant, Mr. Young, and Mrs. Ross entered into an agreement to commit the offense of premeditated murder.

The proof clearly supports a finding that Defendant conspired to kill the victim and that she acted with premeditation during the killing. When viewed in a light most favorable to the State, the record shows that during the weeks leading up to the murder on February 14, 2007, Defendant participated in several conversations with Justin Young and Kimberly Ross about killing the victim. A plan was then developed during which Defendant would take a cab to the Golden Gallon, walk from the store to the victim's residence, and use a ladder to climb in Mr. Young's bedroom window. Defendant would then be given a gun to shoot the

victim while he was in bed asleep. Mr. Young testified that he was supposed to wipe down the gun and place it in the gun cabinet with a clip in it waiting for Defendant. Mr. Young and Mrs. Ross were then to be tied up, and they would tell police that two black men broke into the residence looking for Jimmy Whitmire, a former resident. After the shooting, Defendant was supposed to leave town in Mrs. Ross' Nissan Versa.

The plan went into action on the evening of February 13, 2007, and continued into the early morning hours of February 14, 2007. The plan was originally supposed to have occurred the previous night, but Defendant could not be there. After the victim left for work on the morning of February 13, Mr. Young loaded a .380 pistol with five rounds, wiped it down, and placed it back inside the gun cabinet with one door left slightly ajar. He and Mrs. Ross had several phone conversations with Defendant throughout the day to make sure that she was still coming over and to let her know that everything was "ready to go" when she arrived. Defendant indicated that she would be there around 12:00 to 12:30 a.m. Although not part of the plan, Defendant called two black men, Rodney Tinnel and Floyd Vinson, and arranged for them to be at her residence at the time of the murder.

At 12:54 a.m.,while Mr. Tinnel and Mr. Floyd were still at her trailer, Defendant dressed in dark clothing and called for an MTS cab to pick her up and take her to the Golden Gallon. Defendant then left the store without paying her cab fare and walked to the victim's residence. She climbed up the ladder to Mr. Young's window wearing purple latex gloves, and he helped pull her inside. Mr. Young then gave her some money and the keys to Mrs. Ross' Nissan Versa. They walked down the hall to the living room where Mrs. Ross was waiting. Mrs. Ross then took the .380 pistol out of the gun cabinet and showed Defendant how to use it. Mrs. Ross chambered a round so that all defendant had to do was "point and shoot." Defendant then tied Mr. Young's hands and feet with bailing twine, and she used a phone cord to tie Mrs. Ross. Mr. Young positioned himself on the floor between the chair and the hallway, and Mrs. Ross laid on the couch with her cell phone on the arm of the couch. Defendant walked over to the bedroom where the unarmed victim was sleeping, pushed the door open with her foot, and began shooting. The three fatal shots hit the victim's left forehead, right chest, and left flank above the kidney. Defendant then left as planned in the Nissan. Mrs. Ross called 911 and when police arrived, she and Mr. Young told them that two black men broke into the residence looking for Jimmy Whitmire and shot the victim. The victim was still alive when police arrived, and at no time did Defendant, Mr. Young, or Mrs. Ross render aid to him.

After shooting the victim, Defendant acted with calmness and in taking steps to conceal her crime. She tossed the purple gloves out of the car, and she abandoned the car in a church parking lot. Defendant arrived home and hid the .380 pistol underneath her mattress. In her first interview with Agent Wesson, Defendant denied any involvement in

the murder. She eventually told him about the plan to kill the victim, and she confessed the murder. Although Defendant claims that the dominion and control exerted over her by Mrs. Ross negates the element of premeditation, the record does not support this claim. Mr. Young testified that although Mrs. Ross could be persuasive and provided both him and Defendant with financial assistance, she did not exert any undue influence over them. Defendant herself testified at one point that Mrs. Ross never "personally" asked Defendant to kill the victim, and she never thought that Mrs. Ross was serious about killing the victim.

Based on the foregoing, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant was guilty of the offenses of first degree premeditated murder and conspiracy to commit premeditated first degree murder.

*B. Denial of Motion for Expert Funds*

Defendant argues that the trial court erred in denying her *ex parte* motion for a state-funded expert for further evaluation to determine whether she suffered from a dependant personality disorder and was under the "dominion and control" of Mrs. Ross at the time of the murder.

Prior to trial, Defendant filed a "Sealed Ex Parte Motion For funds For Expert Assistance From [a] Psychiatrist And Clinical Psychologist." In the motion, Defendant asserted the following:

(3). Counsel had spoken with Stephen Montgomery, M.D., prior to the filing of this motion and discussed with him the facts and circumstances of this case. It is counsel's opinion, based upon conversation with Dr. Montgomery and counsels' investigation of critical areas of this case that Dr. Montgomery can and is available to provide Ms. Cook substantial assistance in the investigation, preparation and presentation of her defense, should it become necessary, of her case at sentencing. It is counsel's opinion that the assistance of such competent and experienced expert (see attached affidavit and resume) is warranted in this case. Counsel for Ms. Cook lacks the knowledge, competence, experience, time and resources to ferret out, organize and effectively present the crucial pieces of information that form the basis of Ms. Cook's life story which this expert can provide, which is so necessary to afford Ms. Cook an adequate defense to the offense alleged in this case.

(4). Defense counsel has information that Ms. Cook was abandoned as a child and had developed a dependant personality. The testimony at the first Trial, which ended in a hung jury, shows that one of the co-defendants, wife of the

deceased, was a very persuasive and controlling woman who took Ms. Cook in and influenced and manipulated her. Further questions arose during jury deliberations regarding her mental state. Ms. Cook is facing incarceration for a period of not less than life in prison. This evaluation is necessary to determine if a defense of diminished capacity can be supported.

An *ex parte* hearing on the motion was held on September 3, 2008. At the hearing, counsel noted that Defendant's first trial ended in a hung jury and stated:

At trial there was obviously - - I think the Court probably remembers - - our defense was the type of diminished capacity that Ms. Cook was under the control of the co-defendant, who was the wife of the deceased and basically led by the wife of the deceased, who has since pled guilty to first degree murder and is serving her sentence, to act, again defense's position, under the domination of the co-defendant.

The Court will also remember that there was a question during the jury deliberation with regard to the mental state of the defendant, Ms. Cook, and whether or not that they needed information from a professional with regard to Ms. Cook's mental state.

Defense counsel further noted that he had relayed the facts of the case over the phone to Dr. Montgomery who was in agreement that "an evaluation for something called a dependent personality disorder would be helpful in this case to determine her mental status at the time of the alleged homicide and to the degree of domination which she could be led to." After the hearing, the trial court entered a written order denying Defendant's request because Defendant failed to "establish a particularized need for the requested services." The court further noted that Defendant's case was set for trial on October 10, 2008, and that granting the *ex parte* motion would "interfere with the orderly administration of justice."

According to Tenn. S. Ct. R. § 5(a)(1):

In the trial and direct appeal of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases involving indigent petitioners, the court, in an *ex parte* hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

-23-

The decision to authorize expert services lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Barnett*, 909 S.W.2d 423, 431 (Tenn. 1995). In determining whether an indigent defendant is entitled to the assistance of a state-funded psychiatric expert, the Supreme Court in *Barnett* held that,

> the defendant must make a threshold showing of particularized need. To establish a particularized need, the defendant must show that a psychiatric expert is necessary to protect his right to a fair trial. Unsupported assertions that a psychiatric expert is necessary to counter the State's proof are not sufficient. The defendant must demonstrate by reference to the facts and circumstances of his particular case that appointment of a psychiatric expert is necessary to insure a fair trial. Whether or not a defendant has made a threshold showing is to be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made.

*Id*. at 431; *See also* Tenn. S. Ct. R. § 5(c)(1)-(2). In order to make a threshold showing, the defendant must first show that: "(1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it will materially assist him in the preparation of his case." *Barnett*, 909 S.W.2d. at 431. Tenn. S. Ct. R. 13 § 5(c)(4) further instructs that particularized need "cannot be established and funding requests should be denied" when the motion only contains:

> (A) undeveloped or conclusory assertions that such services would be beneficial;
> (B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;
> (C) information indicating that the requested services relate to factual issues or matters within the province and understanding of the jury; or
> (D) information indicating that the requested services fall within the capability and expertise of appointed counsel. (Citations omitted).

In the present case, we agree with the trial court that Defendant failed to satisfy the "particularized need" requirement for a state-funded expert. In *State v. Scott*, 33 S.W.3d 746 (Tenn. 2000) the Supreme Court held that an indigent defendant charged for rape and aggravated assault had a particularized need for expert assistance in the field of DNA evidence. The court noted:

Far from justifying the request with "unsupported assertions," the appellant's counsel listed in meticulous detail the reasons needed for the expert assistance. For instance, the appellant's counsel stated that expert assistance was needed to establish a familiarity with proper DNA protocols and to point to relevant issues and lines of cross-examination. In support of these assertions, counsel offered expert testimony from witnesses who stated that expert assistance in this area was absolutely crucial to competent representation given that the subject matter was inordinately complex and beyond the common understanding of most attorneys. One of the appellant's experts further opined that it was doubtful that the appellant's attorney could not even know the relevant issues involved in DNA analysis without some type of expert assistance.

Beyond general assertions of need, however, the appellant also established that because the DNA examinations from the FBI and LabCorp reached inconsistent results regarding the donor of the hair samples, expert assistance was especially needed to help determine whether the samples were contaminated and why the appellant was apparently excluded as a donor in one test involving PCR analysis. Finally, counsel demonstrated that he needed expert assistance to understand why some reports mentioned that the samples of blood from the appellant's clothing contained the DNA of an unidentified third person.

*Id*. at 753-54. The Court further concluded that defendant demonstrated a "reasonable likelihood that the expert assistance would be of material help in the preparation of his case." *Id*. at 754.

In the present case, Defendant failed to give a detailed explanation for the need for expert assistance. Defendant's motion contains bare assertions that the assistance of an expert is necessary for the "investigation, preparation, and presentation" of her defense and to "determine if a defense of diminished capacity can be supported." There is also an assertion, without any further support, that defendant was abandoned as a child and developed a dependant personality. There is nothing in defendant's motion to suggest that she lacked the capacity to form the mental state required to commit the offenses in this case. This Court has held a defendant "must provide the court with more than a rough framework as to how the services would be useful. Indeed, most experts would be helpful in investigating, documenting, and presenting evidence." *State v. Donovan Edward Daniel*, No. W2000-00981-CCA-R3-CD, 2001 WL 1690196 at *12, (Tenn. Crim. App. Dec. 28, 2001) *perm. app. denied* (Ten. June 3, 2002).

-25-

Moreover, as pointed out by the State, even if it was error for the trial court to deny Defendant's motion for a state-funded expert, such error was harmless beyond a reasonable doubt. Although Defendant claimed that she was under the "dominion and control" of Mrs. Ross at the time of the murder and would do anything that she asked, Defendant at trial testified that Mrs. Ross never "personally" asked her to kill the victim. Therefore, we affirm the trial court's denial of Defendant's motion for a state-funded expert.

*C. Failure to Charge the Jury that Megan Jones was an Accomplice*

Defendant next argues that because Megan Jones participated in conversations about killing the victim, the trial court erred in not instructing the jury Ms. Jones was her accomplice. We disagree.

In *State v. Thomas*, 158 S.W.3d 361, 401-02 (Tenn. 2005), the Supreme Court, quoting *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim.. App. 1997) explained the role of an accomplice as follows:

> "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). The test generally applied in determining whether a witness is an accomplice is whether the alleged accomplice would be indicted for the same offense charged against the defendant. See id. In this state, if the offense in question was not committed by the person's own conduct, the person may, nonetheless, be criminally responsible as a principal to the offense if the person solicits, directs, aids, or attempts to aid another person to commit the offense. See Tenn. Code Ann. § 39-11-402(2).

In the present case, as in *Thomas*, the proof fails to establish that Megan Jones "solicited, directed, aided, or attempted to aid" Defendant in the offense of first degree murder or conspiracy to commit first degree murder. *Thomas*, 158 S.W.3d at 402.

The proof shows that although Megan Jones was present during conversations when Mrs. Ross discussed killing the victim, Ms. Jones testified that she never took them seriously, and she did not participate in the planning or killing of the victim. Ms. Jones had moved out of Defendant's residence a week before the murder because Defendant had taken out a retraining order against her, and she was not allowed near Defendant or the trailer. There was no testimony that Ms. Jones had any contact with Defendant during that time, and there was no testimony that Ms. Jones was present at the victim's residence before or after the

murder.  None of the witnesses, including Defendant, who testified at trial implicated Ms. Jones in the murder.

Because there is nothing in the record to show that Ms. Jones could be indicted for the same offenses charged against Defendant, she was not an accomplice, and the trial court did not err in failing to submit an accomplice instruction to the jury.

*D. Length of Sentence*

Defendant contends that the sentence imposed by the trial court is excessive.  She complains that the trial court imposed her sentence for conspiracy to commit first degree murder, a Class A felony, in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and that the trial court erred in ordering her life sentence for first degree murder  to be served consecutively to her twenty-year sentence for conspiracy.

As a Range I, standard offender, Defendant is subject to a sentence range of between fifteen and twenty-five years for her conviction for conspiracy to commit first degree murder. T.C.A. § 40-35-112(a)(1).  The trial court applied the following enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior; the Defendant was a leader in the commission of an offense involving two (2) or more criminal actors; the Defendant before trial, or sentencing, failed to comply with the conditions of a sentence involving release into the community; and the Defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense.  T.C.A. § 40-35-114(1), (2), (8), and (9).  The court also considered that Defendant was on probation at the time of the offenses in this case.  T.C.A. § 40-35-114(13).  The trial court placed little weight on the factor that Defendant used a firearm during the offense, but placed "great weight" on the remaining factors.  The court found that no mitigating factors were present.

Based on the presence of the enhancement factors and the great weight attributed to several of those factors, and the lack of mitigating factors, the trial court sentenced Defendant, as a Range One, standard offender, to twenty years for conspiracy to commit first degree murder.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper.  *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn.2001). When a Defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, " 'is conditioned upon the affirmative showing in the

record that the trial court considered the sentencing principles and all relevant facts and circumstances.' "*State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 Tenn.1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is *de novo. Carter*, 254 S.W.3d at 345 (quoting *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004); *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App.1992)).

*Enhancement Factors*

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections-102 and-103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the Defendant wishes to make in the Defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

In this case, Defendant argues that her sentence is excessive as to her conviction for conspiracy to commit first degree murder. She contends that the trial court found enhancement factors based on facts not admitted by Defendant or found by a jury in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

Effective on June 7, 2005, the Tennessee Legislature amended the sentencing code to comply with the *Blakely* decision. Defendant's conduct in this case occurred subsequent to the enactment of the 2005 amendments and therefore *Blakely* does not apply. In *Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

[A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

Thus, a trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id*., 254 S.W.3d at 345 (citing *State v. Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App., at Jackson, July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts").

The record reflects that the trial court considered the evidence presented at trial and the sentencing hearing. The court further considered the presentence report, the principles of sentencing and the arguments as to sentencing alternatives, the nature and characteristics of the offenses, the evidence offered by the parties on enhancement and mitigating factors, and the potential for rehabilitation or treatment. The trial court further noted that with regard to Defendant's first degree murder conviction, the State had not sought the death penalty or life without parole. Accordingly, the trial court imposed the only available sentence of life in prison.

In considering the enhancement factors, the trial court noted that defendant had previously been convicted of two counts of theft under $500 and two counts of possession of a Schedule VI drug. The court found that defendant was a leader in the commission of an offense involving two or more criminal actors because the proof showed that defendant not only killed the victim, but she was an active participant in the "physical activity" leading up to the murder. The trial court noted that Defendant had twice violated conditions of a probationary sentence out of Williamson County, and she was on probation for theft when she committed the present offenses.

-29-

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of facts that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of twenty years for conspiracy to commit first degree murder. Defendant is not entitled to relief on this issue.

*Consecutive Sentencing*

Defendant contends that the trial court erred in ordering her twenty-year sentence for the conspiracy conviction to be served consecutively to her life sentence for murder. A trial court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of the defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b); *See also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The length of the sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), 103(2). Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court. *State v. Hastings*, 25 S.W.2d 178, 181 (Tenn. Crim. App. 1999).

In the event the trial court finds defendant is a "dangerous offender," it must also determine whether the consecutive sentences (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with general principles of sentencing. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

In this case, the trial court found that consecutive sentencing was appropriate based on a finding that Defendant was a dangerous offender and explained its reasoning as follows:

> In this case, the [victim] was asleep in bed, was shot three times at fairly close range. The facts and circumstances of the case clearly make that out.
>
> And had she not pulled the trigger, it may have been that the other two conspirators would not have done it. It is sheer speculation to say that the other two would have committed the murder had she not done it. I think that puts her in a separate and distinct category.

The court further stated that the sentence was "justly deserved in relation to the seriousness of the offense and no greater than that deserved under the circumstances of this offense." Although the trial court did not articulate all of the *Wilkerson* factors, the record shows that the court also found that consecutive sentencing was appropriate based on the fact that Defendant was on probation at the time of the offenses. T.C.A. § 40-35-115(b)(6). The presence of a single factor is sufficient to justify the imposition of consecutive sentences. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). This issue is without merit.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-31-